UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS

———

Nos. 4:24-cv-00837, 4:24-cv-00838

———

**Keith Black et al.,**

*Appellants,*

v.

**Donald R. Triplett, Jr.,**

*Appellee.*

———

## OPINION AND ORDER

Creditors Keith Black and Jeremy Haltom appeal the bankruptcy court's grant of discharge to debtor Donald Triplett and the bankruptcy court's denial of their motions to sanction debtor. For the reasons below, the judgment of the bankruptcy court is affirmed with respect to the discharge but reversed and remanded with respect to the sanctions motions.

### I. Background

Debtor's line of work is construction and remodeling. He has owned or been associated with various entities, including Preferred Platinum Construction, DFW Design and Remodeling, and Copper Creek Distributors. Creditors have done business with debtor in the past.

These parties have long been in litigation. In 2017, creditor Haltom initiated two causes of action against debtor in state court for breach of contract and fraud. In 2018, creditor Black initiated another. In 2019, creditor Black received a final judgment in his favor for close to $200,000. Doc. 8 at 14. Debtor then petitioned for Chapter 7 bankruptcy in Sherman before Judge Rhoades. *In re Triplett*, No. 4:19-bk-42570, Doc. 1 (Bankr. E.D. Tex. Sept. 19, 2019). He indicated in the petition that his creditors numbered in the 100s. *Id.* at 6. The bankruptcy court stayed the pending state-court litigation.

In October of 2019, debtor appeared for his § 341 meeting of the creditors, at which the Valks (creditors' associates) questioned him. Then the Valks filed a Rule 2004 motion for examination, seeking to depose debtor. Doc. 3-1 at 2247.[1] To accommodate the potential Rule 2004 examination, the Valks, Black, and Haltom then filed a motion to extend their deadline for filing complaints under §§ 523 and 727 to object to discharge. Doc. 8 at 16. Judge Rhoades granted the motion to extend and then, in February of 2020, granted the Rule 2004 motion. In its Rule 2004 order, the bankruptcy court ordered debtor to appear for a 10-hour, two-day Rule 2004 examination and to take reasonable steps to produce a host of documents, listed in exhibit A of that order, which related to his financial condition. Doc. 3-1 at 868–70.

Then discovery difficulties arose. Creditors assert that debtor failed to provide complete information and that he was concealing financial accounts. Doc. 8 at 17. So they and the Valks filed a second motion to extend the deadline for filing complaints under §§ 523 and 727. *Id.* The bankruptcy court held a hearing on that second motion and granted it. Doc. 3-2 at 474 (R. 7935). In its order on the second motion to extend, the bankruptcy court ordered debtor to "produce . . . all documents, materials, and information requested by Creditors, and which are identified in Exhibit 'A' attached to the Court's [Rule 2004 order]." *Id.* at 480 (R. at 7941). The court also lengthened the time of debtor's deposition to an indefinite duration: "until completed by Creditors." *Id.*

Creditors then initiated the adversary proceedings that are now on appeal before this court. *Black v. Triplett*, No. 4:20-ap-04057, Doc. 1 (Bankr. E.D. Tex. May 15, 2020); *Haltom v. Triplett*, No. 4:20-ap-04059, Doc. 1 (Bankr. E.D. Tex. May 15, 2020). Those proceedings were before Judge Searcy rather than Judge

---

[1] For Doc. 3-1 citations, the page number cited is the same as the page number of the record on appeal. For Docs. 3-2, 3-3, and 3-4, the citation will include a parenthetical with the page number of the record on appeal—e.g., (R. at 2247).

- 2 -

Rhoades. Creditors asserted three grounds for denying discharge under 11 U.S.C. § 727:

1. that debtor concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information from which his financial condition or business transactions might be ascertained, violating § 727(a)(3);

2. that debtor knowingly and fraudulently made false oaths or accounts in connection with the case, violating § 727(a)(4)(A); and

3. that debtor refused to obey lawful court orders in the case, violating § 727(a)(6)(A).

*See, e.g.*, Doc. 3-1 at 2228–30.

On May 18 and May 19, 2020, debtor sat for the Rule 2004 examination. Unsatisfied with that two-day deposition, creditors filed a motion to compel him to complete the Rule 2004 examination by sitting for another deposition and producing the documents they were seeking. Doc. 3-2 at 952 (R. at 8413). Judge Rhoades granted that motion in part, authorizing creditors to depose debtor for another six hours, which they did on August 8, 2020. *Id.* at 970 (R. at 8431). After that six-hour deposition, still unsatisfied with debtor's cooperation, creditors filed a second motion to compel, seeking still-undisclosed documents and asking the court to sanction debtor for noncompliance. Doc. 3-1 at 2310. Judge Rhoades held two hearings on that second motion to compel. At the second hearing, when called to answer whether he had complied with court orders to produce financial documents, debtor invoked his Fifth Amendment right to remain silent. Doc. 3-3 at 3167 (R. at 13262).[2] Because debtor refused to testify, the bankruptcy court drew the adverse inference that he had not fully complied with court orders and granted the second motion to

---

[2] Debtor testified that his other counsel, who was representing him in a criminal prosecution, advised him to invoke his Fifth Amendment right. Doc. 3-2 at 2317–18 (R. at 9778–79).

compel insofar as it requested sanctions of $500. *Id.* at 3193–94 (R. at 13288–89).

In June of 2022, in the adversary proceedings before Judge Searcy, debtor filed motions for death-penalty sanctions against creditors, seeking dismissal of the adversary proceedings. His motions were based on creditors' allegedly improper discovery during his bankruptcy and other lawsuits that they had filed against him in state and federal courts. *See, e.g.*, *id.* at 1789 (R. at 11884). In the motions, debtor told a story about how he uncovered the Valks' tax fraud, how he brought a whistleblower suit, and how all the litigation and bankruptcy were the result of the Valks' retaliatory scheme against him. He argued that the Valks recruited Haltom and Black, creditor–appellants here, to bring the lawsuits against him that ultimately led to his bankruptcy petition. He also alleged that the Valks had possession of many of his financial records and destroyed them to prevent him from fulfilling his bankruptcy disclosure requirements. In response to debtor's death-penalty-sanctions motions, creditors filed their own motions for sanctions, seeking to strike debtor's motions and to require him to reimburse their attorney fees incurred in connection with his motions. *See, e.g.*, Doc. 3-4 at 306 (R. at 13661).

The adversary proceedings went to a joint, four-day trial in April of 2024. Doc. 3-2 at 1996–2573 (R. at 9457–10034). Debtor was absent on the first day, preventing creditors from questioning him during their case-in-chief, *id.* at 1998 (R. at 9459), but he showed up thereafter, *id.* at 2237 (R. at 9698). Because of debtor's absence and creditors' need to put on a case-in-chief, the parties agreed to have exhibit 44—a "compilation of excerpts of Triplett's prior testimony"—read into the record. Doc. 8 at 50. Debtor's case-in-chief consisted of testimony from two of debtor's previous attorneys (David Stephan and Joyce Lindauer) and from debtor himself. Creditors extensively cross-examined debtor on the last two days of trial. *See* Doc. 3-2 at 2339–2547 (R. at 9800–10008).

Judge Searcy found that creditors failed to carry their burden of proving by a preponderance of the evidence (1) that debtor failed to keep and preserve adequate records, (2) that debtor knowingly made a false statement under oath, and (3) that debtor willfully refused to obey a court order. *See id.* at 2610–2617 (R. at 10071–10078). Accordingly, the bankruptcy court found in favor of debtor, granting him discharge of his obligations. *Id.* at 2622, 2628 (R. at 10083, 10089). The court dismissed debtor's motions for death-penalty sanctions as moot and also dismissed creditors' motions for sanctions as moot. *Id.* at 2626–27 (R. at 10087–88).

Creditors then filed their notices of appeal. This court consolidated the two appeals, received full briefing, and heard oral argument. Creditors raise seven issues on appeal. In short, they argue that the bankruptcy court erred by failing to penalize debtor for his absence on day one, erred by failing to deny discharge on the three § 727 grounds, erred by improperly burden shifting, erred by giving too little evidentiary weight to exhibit 44, and erred by denying their sanctions motions as moot.

## II. Analysis

### A. Standard of review

"A district court may affirm, reverse or modify a bankruptcy court's ruling, or remand the case for further proceedings." *In re Black*, No. 2:16-cv-13200, 2017 WL 3034348, at *5 (E.D. La. July 18, 2017).[3] This court reviews the bankruptcy court's findings of fact for clear error, its conclusions of law de novo, and its application of law to the facts de novo. *In re Bass*, 171 F.3d 1016, 1021 (5th Cir. 1999). The court reviews evidentiary decisions for abuse of discretion. *In re Jacobsen*, No. 4:10-cv-00117, 2010 WL 11538235, at *1 (E.D. Tex. Dec. 27, 2010), *aff'd*, 432 F. App'x 341 (5th Cir. 2011) (unpublished). Error that does not affect substantial rights

---

[3] While the quoted language no longer appears in Rule 8013 of the Federal Rules of Bankruptcy Procedure, "logic still compels the same conclusion with respect to the appellate powers of the District Court." *In re Jones v. Pennymac Loan Servs., LLC*, No. 7:24-cv-00200, 2025 WL 786524, at *2 n.2 (S.D.N.Y. Mar. 12, 2025).

does not warrant reversal. *See* Fed. R. Bankr. P. 9005; Fed. R. Civ. P. 61; *In re Age Ref., Inc.*, 801 F.3d 530, 543 & n.42 (5th Cir. 2015).

**B. Debtor's absence on the first day of trial**

Federal Rule of Bankruptcy 4002 requires the debtor to "attend the hearing on a complaint objecting to discharge and, if called, testify as a witness." Fed. R. Bankr. P. 4002(a)(2). Many courts have made clear that Rule 4002 imposes a legal duty on debtors to attend the discharge trial in an adversary proceeding—subpoena or no—and that failure to attend may warrant denial of discharge. *See, e.g.*, *In re Alboghdady*, No. 1:23-bk-10022, 2024 WL 1628836, at *3 (Bankr. E.D. Va. Apr. 15, 2024); *In re De Ronde*, 509 B.R. 223, 228 (Bankr. S.D. Iowa 2012); *In re MacPherson*, 129 B.R. 259, 261–62 (M.D. Fla. 1991). The bankruptcy court has discretion on how to handle an absent debtor: it may enter a default judgment denying discharge, or it may require the creditors to establish their claims under the applicable burden of proof. *In re De Ronde*, 509 B.R. at 228.

Creditors argue that the bankruptcy court erred by forcing them to proceed with their case-in-chief without debtor present in violation of Rule 4002. Doc. 8 at 27–31. They claim that the bankruptcy court blamed them for not subpoenaing debtor, denied their request for a continuance, and put them to the "binary choice" of either proceeding in debtor's absence or having their claims dismissed for want of prosecution. *Id.*; *see also* Doc. 11 at 12–14. They suggest that this alone warrants reversal and denial of discharge. Debtor responds by arguing that Rule 4002 is not applicable law, that debtor ultimately did attend trial and thus did not violate Rule 4002, and that creditors waived any Rule 4002 objection by proceeding with their case-in-chief. Doc. 10 at 10–15.

There is no question that Rule 4002 required debtor to attend on the first day and testify when called as a witness. Contrary to debtor's assertion, that rule does apply to adversary proceedings such as this one. *See, e.g.*, *In re Alboghdady*, 2024 WL 1628836, at *2–3 ("The Plaintiff timely filed its Complaint in this adversary proceeding . . . . Bankruptcy Rule 4002(a)(2) requires the debtor

to attend the hearing on a complaint objection to his or her dis-
charge and to testify if called as a witness."). Debtor's presence
for his own case-in-chief did not satisfy that obligation because he
was not present to testify when creditors sought to call him as a
witness, which the rule unambiguously requires.

Nor did creditors waive their objection under the rule by elect-
ing to go forward. Going forward with the case-in-chief is one of
the two ways contemplated by the caselaw for a creditor to pre-
serve its objection to debtor's absence. *See, e.g.*, *In re MacPherson*,
129 B.R. at 261. As creditors point out, the bankruptcy court
blamed them for debtor's absence, Doc. 3-2 at 2003 (R. at 9464),
thereby making it clear that they were not getting a default judg-
ment. By moving the bankruptcy court to sanction debtor for his
absence, creditors raised the issue sufficiently for the court to
have been able to rule on it. *See* Doc. 3-2 at 1998 (R. at 9459).

However, that does not mean that they are entitled to relief.
As alluded to above, the harmless-error rule applies in the bank-
ruptcy context as well as in any other civil case. *See* Fed. R. Bankr.
P. 9005 ("Fed. R. Civ. P. 61 applies in a bankruptcy case."); Fed.
R. Civ. P. 61 ("At every stage of the proceeding, the court must
disregard all errors and defects that do not affect any party's sub-
stantial rights."). And it applies to the district court's review of
the bankruptcy proceeding as well as to the bankruptcy proceed-
ing itself. *See, e.g.*, *In re Carapella*, 115 B.R. 365, 368 (M.D. Fla.
1990) (finding bankruptcy court's error, if any, harmless), *aff'd
sub nom.*, *Carapella v. United States*, 925 F.2d 1474 (11th Cir. 1991);
*see also McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548,
554 (1984) ("it is well-settled that the appellate courts should act
in accordance with the salutary policy embodied in Rule 61").

The bankruptcy court's error did not prejudice creditors' sub-
stantial rights. They acknowledge in their briefing that Judge
Searcy gave them the option to call debtor for their rebuttal case
if debtor subsequently attended the trial. Doc. 8 at 30; *see* Doc. 3-
2 at 2031 (R. at 9492) ("Mr. Triplett will presumably be here on—
in some form for your case in rebuttal, should you choose to put

him on. And so if he is, great, you know, you can ask him whatever you need to and we'll see how that goes."). But creditors did not choose to call debtor for their rebuttal case because they were able to thoroughly cross-examine him during his case-in-chief. At oral argument on appeal, this court asked creditors whether there were any specific questions that they would have asked debtor on direct examination that they were unable to ask him during cross-examination. They identified none. Instead, they argued that debtor's absence harmed them by, in essence, putting them on Judge Searcy's bad side. That is insufficient to show prejudice.

Creditors also argue that Judge Searcy erred by "apparently not treating testimony elicited by [them] during Triplett's case in chief as [their] evidence." Doc. 8 at 30. This court finds no support in the record for that allegation.

The conclusion that debtor's absence did not affect substantial rights is underscored by the fact that creditors elected to go forward with their case-in-chief rather than requesting a continuance. Creditors argue that Judge Searcy threatened to dismiss their case for want of prosecution unless they proceeded then and there in debtor's absence. But the record suggests otherwise. The bankruptcy court expressly offered them a "short continuance," so that they could have "the opportunity to have a little bit of time to try to get him here." Doc. 3-2 at 2013–14 (R. at 9474–75). Creditors' counsel declined and stated, "I think, Your Honor, we have plenty of information . . . to go forward solely on prior testimony." *Id.* at 2015 (R. at 9476). To be sure, debtor was allegedly evading service, and his counsel would not accept substitute service of a subpoena. *Id.* at 2007, 2013 (R. at 9468, 9474). But still, if creditors truly expected their substantial rights to be affected, then one would expect them to make every effort to compel debtor's attendance. They did not.

Accordingly, as to debtor's Rule 4002 violation, the court finds that creditors have not demonstrated any error that affected their substantial rights and therefore that they have not demonstrated any error warranting reversal.

- 8 -

### C.  Grounds for denial of discharge under § 727

The following four issues raised by creditors relate to the merits of the bankruptcy court's discharge decision. Creditors' burden-shifting issue is addressed in subsection II.C.1 because it pertains only to § 727(a)(3).

The bankruptcy code requires discharge unless a statutory exception applies. 11 U.S.C. § 727(a). When determining dischargeability of a debt, the provisions of § 727(a) are construed strictly against the parties seeking to prevent discharge (i.e., the creditors) and liberally in favor of the debtor. *Laughlin v. Nouveau Body & Tan, L.L.C.*, 602 F.3d 417, 421 (5th Cir. 2010). The objecting creditor bears the initial burden of producing evidence establishing a prima facie case that the particular exception applies. *See In re Duncan*, 562 F.3d 688, 695–96 (5th Cir. 2009). Once the creditor carries that initial burden of production, the burden of production shifts to the debtor to "present evidence that he is innocent of the charged offense." *Id.* at 696. However, "the burden of persuasion rests at all times on the creditor objecting to discharge," *In re Reed*, 700 F.2d 986, 992 (5th Cir. 1983), and to carry that burden the creditor must prove each element of the exception by a preponderance of the evidence, *see In re Beaubouef*, 966 F.2d 174, 178 (5th Cir. 1992) (citing *Grogan v. Garner*, 498 U.S. 279 (1991)).

#### 1.  Concealment of or failure to preserve recorded information, § 727(a)(3)

Section 727(a)(3) provides that the court must grant discharge unless

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

To prevail on the typical failure-to-preserve claim, the objecting creditor must establish two elements: "(1) the debtor failed to maintain and preserve adequate records; and (2) such failure

makes it impossible to ascertain his or her financial condition and material business transactions." *In re Henley*, 480 B.R. 708, 781 (Bankr. S.D. Tex. 2012). Justification is an affirmative defense—the burden of proving it lies with the debtor. *In re Goff*, 579 F. App'x 240, 246 (5th Cir. 2014) (unpublished). To determine whether the failure was justified, a court considers several factors, such as "the education, experience, and sophistication of the debtor; the volume of the debtor's business; the complexity of the debtor's business; the amount of credit extended to the debtor or his business; and any other circumstances that should be considered in the interest of justice." *In re Sauntry*, 390 B.R. 848, 855 (Bankr. E.D. Tex. 2008). "The bankruptcy court has 'wide discretion' in analyzing these shifting burdens, and its determination is reviewed for clear error." *In re Duncan*, 562 F.3d at 697.

The bankruptcy court, Judge Searcy, found that creditors "failed to sustain their burden and prove by a preponderance of the evidence that [debtor] destroyed or failed to keep such records from which his financial condition and business transactions may be ascertained sufficient to deny him a discharge under 11 U.S.C. § 727(a)(3)." Doc. 3-2 at 2612 (R. at 10073). Creditors argue that this was error because of debtor's failure to file tax returns and failure to maintain sufficient business records. Doc. 8 at 32–35; Doc. 11 at 14–21. The need for business records was heightened, they suggest, because debtor commingled business and personal funds in the same accounts. They argue that without some way to distinguish between those funds, ascertaining debtor's financial condition is impossible. As to the tax returns, while debtor created a return for 2017, he failed to file it until after the bankruptcy proceedings began. He did not create or file returns for the years after 2017.

The bankruptcy court did not clearly err. Start with the argument that failure to create and failure to file tax returns are grounds for denying discharge under § 727(a)(3). By the subsection's plain language, it is not clear that it requires a debtor to create or file tax returns at all. The subsection uses the following

verbs: concealed, destroyed, mutilated, falsified, failed to keep, and failed to preserve. Failure to create and failure to file tax returns could not fall within concealing, destroying, mutilating, or falsifying. Those are active; failure to create and failure to file are passive. That leaves failure to keep and failure to preserve.

Neither failure to keep nor failure to preserve encompasses the failure to *create* tax returns in the first instance. The word preserve unambiguously requires the object, here the recorded information, to already exist. If the tax returns do not exist, then one cannot preserve them or fail to do so. Similarly, while the meaning of the word keep is ambiguous between keeping an existing object and the act of recording (e.g., keeping a journal), the better reading of failure to keep in the statute also requires the record to already exist. That is because every other verb in the statute—concealed, destroyed, mutilated, falsified, failed to preserve—presupposes the record's existence. It would therefore give "unintended breadth" to the subsection if the court were to read it to require the debtor to actively create records rather than simply to keep them once they already exist. *Yates v. United States*, 574 U.S. 528, 543 (2015) (discussing "the principle of *noscitur a sociis*—a word is known by the company it keeps").

Nor do the failure to keep and the failure to preserve encompass the failure to *file* existing tax returns. In this context, preserve means "to keep safe from injury, harm, or destruction"; "to keep alive, intact, or free from decay"; or "to keep up and reserve for personal or special use." *Preserve*, Merriam-Webster, https://www.merriam-webster.com/dictionary/preserve (last visited July 20, 2025). And, read in the context of the other verbs in the subsection, keep means "to retain in one's possession or power" or "to have in control." *Keep*, Merriam-Webster, https://www.merriam-webster.com/dictionary/keep (last visited July 20, 2025). Under those definitions, one can easily keep and preserve existing tax returns without filing them—one only needs to hold onto them and prevent their destruction. So the failure to

- 11 -

file them does not equate to the failure to preserve or failure to keep them.

Perhaps a factfinder could determine that debtor's creation of, but not actually filing, his 2017 return amounted to the concealment of that return. In other words, one could argue that debtor did not simply *fail to file* his 2017 return but actively *concealed* it. However, the bankruptcy court's factual findings belie that argument. Concealment requires intent to conceal. *In re Chadwick*, 335 B.R. 694, 702 (W.D. Wis. 2005). The bankruptcy court found that, while debtor did not initially file his 2017 return, he did so "as soon as this mistake was discovered." *Id.* at 2608 (R. at 10069). Generally, it found that debtor "made significant efforts" and "sincerely attempted to meet the disclosure requirements necessitated by a bankruptcy filing." Doc. 3-2 at 2611 (R. at 10072). Those findings preclude a finding of intentional concealment. The bankruptcy court was far better situated than this court to make those factual determinations and the corollary factual determination that debtor did not conceal his 2017 return. It did not clearly err.

The court is aware that other courts applying § 727(a)(3) have denied discharge where the debtor failed to file tax returns for multiple years. *See, e.g.*, *In re Gartner*, 326 B.R. 357, 377 (Bankr. S.D. Tex. 2005). The court is also aware that the Fifth Circuit has called tax returns "quintessential documents" of personal bankruptcy, *In re Dennis*, 330 F.3d 696, 703 (5th Cir. 2003), though that case involved the affirmance of a bankruptcy court's finding that the debtor did keep adequate records. Even if § 727(a)(3) requires creation and filing of tax returns, debtor did not fail to do so with respect to his 2017 tax return. And even though he did not prepare tax returns after 2017, that does not mean that his failure to do so made it impossible to ascertain his financial condition because, in addition to the 2017 return, creditors obtained access to volumes of bank statements, the other "quintessential documents" of personal bankruptcy. *In re Hobbs*, 333 B.R. 751, 757–58 (Bankr. N.D. Tex. 2005); *see also infra* p. 13–14. The bankruptcy court was not

required to find that the absence of tax returns after 2017, or the late filing of the 2017 returns, prevented creditors from ascertaining debtor's financial condition.

Beyond tax returns, creditors argue that debtor failed to keep sufficient business records for his companies, especially where he commingled business and personal funds. Doc. 8 at 34–35; Doc. 11 at 18–21. For example, they point to the bankruptcy court's finding that debtor's "missing records included invoices, time records, spreadsheets, and most records for Debtor's sole proprietorships DFW Design & Remodeling and Preferred Platinum Construction." Doc. 8 at 34 (quoting Doc. 3-2 at 2604 (R. at 10065)). But creditors omit, from the same paragraph in the bankruptcy court's findings, the reason given by defendant for those missing records: the Valks caused them to be destroyed. Doc. 3-2 at 2603–04 (R. at 10064–65). To be sure, the bankruptcy court did not explicitly find that the records *had* been destroyed at the Valks' command. Instead, it found testimony to that effect "credible" and the events "plausible." *Id.* at 2604 (R. at 10065). However, there was seemingly uncontroverted evidence that the Valks were responsible for the missing records. Willie Parker, one of the two Valk employees accused of destroying the records, testified that Ron Valk told him to "get rid of that computer." Doc. 3-3 at 1183 (R. at 11278). The bankruptcy court was not required to find that debtor was at fault for failing to keep records that plausibly were destroyed by another party.[4]

Even if we ignore the wrongfully destroyed records, the bankruptcy court still did not clearly err by finding that the recorded information debtor did keep was adequate. Specifically, as alluded to above, scores of bank statements were preserved. Bank statements are part of "the core of what is necessary to ascertain the

---

[4] To the extent that the question of fault goes to the affirmative defense of justification rather than the elements of creditors' claims, the bankruptcy court probably would have found debtor justified in failing to preserve the invoices, time records, spreadsheets, and other records if it had analyzed the Valks' destruction of the records as an affirmative defense. So any legal error in burden-shifting as to the destroyed records was harmless.

debtor's financial condition." *In re Hobbs*, 333 B.R. at 757 (quoting *In re Nemes*, 323 B.R. 316, 325 (Bankr. E.D.N.Y. 2005)). The crucial time period for records in this case was from approximately September of 2017 to September of 2019—the two years before the bankruptcy filing. *See In re Hahn*, 362 B.R. 542, 548 (Bankr. S.D. Fla. 2007) (citing *In re Losinski*, 80 B.R. 464, 474 (Bankr. D. Minn. 1987)). Creditors were able to obtain bank records for all three of the entities whose records they claim are scarce—Preferred Platinum, Copper Creek Distributors, and DFW Design & Remodeling—for much of the relevant time period and beyond. The record on appeal contains volumes of them. *See, e.g.*, Doc. 3-1 at 4558–4612, 5465–5518 (Preferred Platinum); Doc. 3-2 at 756–857 (R. at 8217–8318) (Copper Creek Distributors); Doc. 3-2 at 1487–89 (R. at 8948–50) (DFW Design & Remodeling).

Creditors do not contest debtor's assertion that they obtained all of the bank statements for Preferred Platinum and Copper Creek Distributors for the relevant time period. *Compare* Doc. 10 at 17–18 *with* Doc. 11 at 18–21. Instead, they argue that bank statements alone are insufficient, at least as to Preferred Platinum, because debtor commingled business and personal funds in his Preferred Platinum business account. However, as debtor points out, Preferred Platinum is a sole proprietorship. That means that under the general rule, debtor's "personal assets and [his] business assets are legally a single financial estate." *Trs. of Amalgamated Ins. Fund v. Sheldon Hall Clothing, Inc.*, 862 F.2d 1020, 1024–25 (3d Cir. 1988) (citing *SEC v. W.L. Moody & Co.*, 374 F. Supp. 465, 472 (S.D. Tex. 1974), *aff'd,* 519 F.2d 1087 (5th Cir. 1975)). That at least mitigates the commingling problem. And if the bank statements for Preferred Platinum were sufficient to evidence debtor's financial condition, then the records for Copper Creek—debtor's husband's company—likely were as well.

Moreover, as to DFW Design & Remodeling, though the bank statements end in 2016, debtor testified that the company ceased to operate in 2016 or 2017. Doc. 3-2 at 502 (R. at 7963). That would likely put its existence outside of the relevant two-year time

period, and the absence of records pertaining to it would not make it impossible to ascertain debtor's financial condition as of the date he filed for bankruptcy. *Cf. In re Hobbs*, 333 B.R. at 757 ("The inability to produce or locate the financial records of her company, in itself, will not deprive Defendant the opportunity for a fresh start, particularly when the company has been dissolved for almost three years before the bankruptcy petition was filed." (citing *In re More*, 138 B.R. 102, 105–06 (Bankr. M.D. Fla. 1992))). The bankruptcy court reasonably deemed them unnecessary.

Creditors frame the bankruptcy court's decision differently: they argue that the bankruptcy court decided that they failed to carry their burden *because* debtor's failure to keep adequate records was justified in light of his "significant efforts to obtain, produce, and disclose records." Doc. 8 at 35–36; *see* Doc. 3-2 at 2611 (R. at 10072). If that was the reason the bankruptcy court concluded that debtor did not fail to keep adequate records, then the bankruptcy court would have erroneously placed upon creditors the burden of disproving debtor's affirmative defense of justification.

However, as discussed above, whether defendant made significant efforts is relevant to whether he concealed recorded information. Similarly, it is relevant to whether he destroyed the recorded information, which the bankruptcy court explicitly concluded he did not. This court reads the bankruptcy court's conclusions of law to rely on debtor's "significant efforts" only insofar as debtor's efforts were relevant. In other words, the bankruptcy court did not rely on debtor's significant efforts in concluding that he did not fail to keep or preserve recorded information—only in concluding that he did not conceal or destroy the information. There was ample evidence in the record from which the bankruptcy court could reasonably have concluded that debtor did not fail to keep or preserve the necessary financial information.

Factfinding was the bankruptcy court's role. That court did not commit clear error by finding that creditors failed to prove

- 15 -

that defendant engaged in any of the conduct or omissions proscribed by § 727(a)(3) in such a way as to make it impossible to ascertain his financial condition or business transactions. Creditors' § 727(a)(3) arguments do not warrant reversal.

### 2. False oaths, § 727(a)(4)(A)

Section 727(a)(4)(A) provides another basis for denying discharge: where "the debtor knowingly or fraudulently, in or in connection with the case . . . made a false oath or account." The elements of this exception are (1) the debtor made a statement under oath; (2) the statement was false; (3) he knew the statement was false; (4) he made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case. *In re Beaubouef*, 966 F.2d at 178. "An omission of an asset can constitute a false oath." *In re Pratt*, 411 F.3d 561, 566 (5th Cir. 2005). The requisite intent to deceive can be established by showing that the debtor made the statement or omission with reckless indifference to the truth. *In re Beaubouef*, 966 F.2d at 178. Statements made in the petition, schedules, meeting of creditors, and Rule 2004 examination are all made under oath. 3 Norton Bankruptcy Law and Practice § 86:11 (3d ed. 2025).

At trial, creditors argued that debtor made several false oaths. The bankruptcy court found that creditors "failed to sustain their burden and prove by a preponderance of the evidence that [debtor] made a false statement under oath regarding such matters sufficient to deny him a discharge under 11 U.S.C. § 727(a)(4)(A)." Doc. 3-2 at 2614–15. (R. at 10075–76). On appeal, creditors argue that they proved several false oaths made by debtor and therefore that reversal is warranted. They claim that debtor failed to disclose an ownership interest in Preferred Platinum and Copper Creek Distributors on his schedule A/B, that he falsely testified that he was not an employee of Copper Creek Distributors, that he underreported both yearly and monthly income for both himself and his spouse, and that he failed to list bank accounts on his statement of financial affairs. Each is addressed in turn.

First, creditors claim that debtor failed to report ownership interests in Preferred Platinum and Copper Creek Distributors on his schedule A/B, a form he filled out under oath. Doc. 8 at 38–39; Doc. 11 at 24. This is how he filled out the relevant portion:

| 19. Non-publicly traded stock and interests in incorporated and unincorporated businesses, including an interest in an LLC, partnership, and joint venture | | |
|---|---|---|
| ☐ No | | |
| ☑ Yes. Give specific information about them................ | | |
| Name of entity: | % of ownership: | |
| DFW Design & Remodeling, INC --Insolvent | 90% | $0.00 |
| TV Arrowhead LLC (1 asset -Lake House) Sold -Funds went to the Trustee | 50% | $325,000.00 |
| Preferred Platinum Construction | | $0.00 |
| Copper Creek Distributors, Inc. | | $0.00 |
| DFW Design & Remodeling | 100% | $0.00 |
| DFW Design Flooring and More | 100% | $0.00 |
| iTri4Life | 100% | $0.00 |
| Platnum Storage GL, LLC | 100% | $0.00 |
| Preferred Platinum Storage Construction | 100% | $0.00 |

Doc. 3-1 at 3993. Creditors claim that he made false oaths when he left the "% of ownership" lines blank for the two entities. Regarding Preferred Platinum, that entity is his d/b/a—he is Preferred Platinum. Debtor could have been reasonably unsure how to answer the ownership-interest question when his d/b/a was the object of the ownership. So the bankruptcy court could have reasonably found that his omission of an ownership percentage, if disclosure of one was even required, was not made with fraudulent intent, knowledge of falsity, or reckless disregard for the truth. And regarding Copper Creek Distributors, the bankruptcy court found that he was not the owner of that company at all; instead, debtor testified that it belonged to his husband, Jose Escoffie. Doc. 3-2 at 2602–03 (R. at 10063–64). Listing it here or in questionnaires to Lindauer (his bankruptcy counsel) can be explained as confused but good-faith attempts to disclose as much information as possible in the limited space afforded by bankruptcy forms. Finding that these "% of ownership" omissions were not intentionally false statements was not clear error.

Second, creditors claim that debtor made a false oath during his Rule 2004 examination when he testified that he was not an employee of Copper Creek, "which directly contradicts his questionnaire responses, where he listed Copper Creek as one of two sources of income." Doc. 8 at 39. This argument lacks merit. One

can receive income from a company without being an employee—such as by working as a subcontractor, which he stated he did in the instrument that creditors cite. *See* Doc. 3-1 at 5845 ("Self Employed sub work from Copper Creek").

Third, creditors claim that debtor made false income-related disclosures. For monthly income, they point out that debtor listed his monthly income as $1,461.50 in his questionnaire filled out for Lindauer but as $1,300 in his sworn schedule I form. Similarly, he listed Escoffie's monthly income as $2,186 in the questionnaire but $2,100 in the schedule I. Doc. 8 at 39 (first citing Doc. 3-1 at 5838; and then citing Doc. 3-2 at 305 (R. at 7766)). And for yearly income in 2018, they point out that the amount debtor listed in his sworn statement of financial affairs ($180,000) is significantly lower than the amount of income calculated from his bank statements ($304,000). *Id.* (first citing Doc. 3-1 at 3999; and then citing Doc. 3-2 at 2434 (R. at 9895)).

Debtor argues that the 2018 income reported in his statement of financial affairs was lower than the amount of deposits reflected by the bank statements because not every deposit into a bank account constitutes income. Doc. 10 at 22. Creditors counter that even if the cash flow came from loans, reimbursements, or insurance settlements, debtor still had a duty to list them as income because the Bankruptcy Code defines income broadly for purposes of the statement of financial affairs. Doc. 11 at 22. Assuming creditors are technically correct about what debtor should have listed, that still does not establish that the bankruptcy court clearly erred in failing to find fraudulent intent. Debtor could have been understandably confused as to exactly what type of income he was required to report. *Cf. Dranichak v. Rosetti*, 493 B.R. 370, 380 (N.D.N.Y. 2013) ("the Court finds that confusing 'net income' with 'gross income,' as Debtor appears to have done, was merely a neglectful mistake"). Again, the bankruptcy court found that debtor "sincerely attempted to meet the disclosure

- 18 -

requirements necessitated by a bankruptcy filing." Doc. 3-2 at 2611 (R. at 10072).[5] The record does not clearly reflect otherwise.

Regarding the disparities in monthly incomes, it is again not clear that debtor possessed the fraudulent intent or even reckless-ness necessary for denying discharge under § 727(a)(4)(A). The differences were minor enough ($86 for Escoffie, $161.50 for debtor) that they could have been the result of imprecise calcula-tion—not fraud. There was no clear error as to debtor's income-related statements.

Fourth and last, creditors claim that debtor made a false oath by omitting bank accounts from his statement of financial affairs. Doc. 8 at 39. They claim that he admitted it during trial. *Id.* (citing Doc. 3-2 at 2473 (R. at 9934)). However, that exchange during trial indicates that debtor, if his testimony is believed, earnestly thought that he was properly filling out the forms:

> And as I'm reading the document, it basically indicates—it's trying to establish your financial assets, not your bank accounts. And I believe that Ms. Lindauer provided the bank accounts that had balances in them. That's what I—that's how I read this. And, again, I'm not an attorney. But as I read the document, I don't believe that this document is asking in this location for every bank account that I've ever had.

Doc. 3-2 at 2473 (R. at 9934). The bankruptcy court was entitled to believe this testimony and conclude that creditors failed to prove fraudulent intent.

To the extent that debtor made any false statements under oath, the factual record did not require the bankruptcy court to find fraudulent intent or reckless disregard of the truth—an ele-ment of creditors' claim. Their § 727(a)(4)(A) argument does not require reversal.

---

[5] While this language comes from a paragraph in the bankruptcy court's § 727(a)(3) analysis, it is equally applicable to this issue.

### 3.  Refusal to obey a court order, § 727(a)(6)(A)

Section 727(a)(6)(A) provides the final relevant basis for denying discharge: where "the debtor has refused, in the case . . . to obey any lawful order of the court, other than an order to respond to a material question or to testify." The elements of that exception are (1) the court issued an order directed at the debtor; (2) the order was lawful; (3) the order was not one requiring a response to a material question or to testify; and (4) the debtor refused to obey the order. *In re Wells*, 426 B.R. 579, 608–09 (Bankr. N.D. Tex. 2006). "A debtor forfeits his discharge for refusing to obey a court order only in cases of willful disobedience, and not merely for inadvertence or mistake." *In re Meredith*, No. 3:04-ap-01110, 2005 WL 5468745, at *7 (Bankr. M.D. La. Dec. 29, 2005) (citing *In re Jones*, 490 F.2d 452, 456 (5th Cir. 1974)), *aff'd*, 231 F. App'x 321 (5th Cir. 2007) (unpublished).

At trial, creditors pointed to four of Judge Rhoades's orders that debtor allegedly violated. With respect to each, the bankruptcy court concluded that creditors "failed to sustain their burden and prove by a preponderance of the evidence that [debtor] willfully refused to obey a lawful order of this Court sufficient to deny him a discharge under 11 U.S.C. § 727(a)(6)(A)." Doc. 3-2 at 2616–17 (R. at 10077–78).

On appeal, creditors reassert debtor's noncompliance with the same four orders:

- the Rule 2004 order, Doc. 3-1 at 868;
- the order granting creditors' second motion to extend the deadline for filing complaints under §§ 523 and 727, Doc. 3-2 at 479 (R. at 7940);
- the order granting creditors' motion to compel debtor to complete the Rule 2004 examination, Doc. 3-2 at 970 (R. at 8431); and
- the order granting in part and denying in part creditors' motion to compel discovery and request for sanctions, Doc. 3-3 at 3193 (R. at 13288).

Doc. 8 at 41–42. Creditors make essentially two arguments: first, that debtor refused to sit for his Rule 2004 examination when ordered and as ordered; and second, that debtor refused to produce the documents required by the orders. *See* Doc. 8 at 41–47; Doc. 11 at 25–29.

Debtor does not appear to have refused to sit for the Rule 2004 examination. Creditors point to his assertion (at the beginning of the examination) that he would stay "[f]or five hours today and tomorrow. And that's it. When the clock reaches five hours, I'm done for the day. That's the judge's order." Doc. 3-2 at 483 (R. at 7944). That is indeed what the Rule 2004 order mandated. Doc. 3-1 at 869. Creditors point out that the requirement had been changed by the bankruptcy court's order granting their second motion to extend, which required him to sit "from day to day, until completed by creditors." Doc. 3-2 at 480 (R. at 7940). But in spite of his initial comment, he ultimately did sit for three days. Doc. 3-2 at 481–535 (R. at 7942–96) (May 18, 2020); Doc. 3-2 at 575–630 (R. at 8036–91) (May 19, 2020); Doc. 3-2 at 972–1026 (R. at 8433–87) (August 8, 2020). At trial, he explained the "five hours" statement as being based on an honest misunderstanding of Judge Rhoades's orders, specifically that he was unaware that the judge had "changed her mind." Doc. 3-2 at 2313 (R. at 9774). Judge Searcy was entitled to believe this testimony and find that any failure to comply with the Rule 2004 order was not willful. Even if not, the bankruptcy court could have found that he actually complied with the second order by sitting for the examination until completed by creditors.

Creditors also point out that debtor "did not sit for the Bankruptcy Rule 2004 Examination until over a month after the date ordered by the Bankruptcy Court." Doc. 11 at 28. By making that argument, they blame debtor for an extension that they requested. *In re Triplett*, No. 4:19-bk-42570, Doc. 116 at 6 (Bankr. E.D. Tex. Mar. 25, 2020) (seeking postponement from April 7, 2020, to May 18, 2020, to "allow the Creditors to comply with the Second Order to Extend, which requires the 2004 Examination take place in

person at the Court's physical location"). Thus, creditors' arguments about the Rule 2004 examination do not warrant reversal.

They also argue that debtor failed to produce responsive documents after being ordered repeatedly to do so. The Rule 2004 order required debtor to "take any reasonable actions necessary" for creditors to obtain certain documents—listed in exhibit A of that order—and to "produce" any such documents that were "in his possession or control." Doc. 3-1 at 869–70. The subsequent order, granting creditors' second motion to extend, ordered debtor to produce "all documents, materials, and information requested by Creditors, and which are identified in Exhibit 'A' attached to the [Rule 2004 order]." Doc. 3-2 at 479–80 (R. at 7940–41). In short, creditors correctly argue that debtor did not himself produce every document listed in exhibit A. Debtor's counsel, Lindauer, made as much clear at trial:

> Q. So if the 2004 order says you are to produce all documents in Exhibit A that are in your control, does control mean that if you can call the bank to get the information or you can call the IRS to get information, that you are to do that?
>
> A. Yes.
>
> Q. Did Mr. Triplett do that?
>
> A. No. Because you told him not to do it because you said you did not trust the information he would get himself.

*Id.* at 2222 (R. at 9683).

However, as that quoted exchange also shows, Lindauer testified that she and debtor were informed that creditors were going to directly subpoena the requested information from the banks, whether debtor produced it or not. And in his Rule 2004 examination, debtor testified that he believed it to be reasonable to "search high and low" and produce anything in his possession, but not to "go to any expense" to obtain documents that the other party could obtain through subpoena. *Id.* at 489 (R. at 7950). A reasonable factfinder could surely conclude that, in such

- 22 -

circumstances, debtor did not fail to "take any reasonable actions necessary" to ensure that creditors obtained the information. He did not need to incur expenses to procure something that would not be used anyway.

Insofar as the second order differed in its requirements—i.e., by not having a "reasonable actions" qualifier—the bankruptcy court still could have found that debtor produced all of the documents required by the second order. When asked about debtor's compliance with the production requirements, Lindauer testified the following:

> But once you told us—or Mr. Reed told us that you all were going to subpoena all of these records yourselves and that if we subpoenaed them, you didn't want them because you didn't trust what we would get, then we didn't go to the trouble to subpoena them.

*Id.* at 2223 (R. at 9684). If creditors did indeed represent that they did not "want" and would not use the documents produced by debtor, then it would be reasonable to interpret the second order as no longer requiring debtor to produce them. They were no longer "requested by Creditors," an express term of the second order. *Id.* at 480 (R. at 7941). Or so Judge Searcy could have reasonably concluded.

Creditors emphasize Judge Rhoades's response made at a hearing after creditors' counsel walked through their version of the events. Judge Rhoades said, "it sounds like you've got some ground to me, already, to file a motion—a complaint seeking denial of discharge." *Id.* at 469 (R. at 7930). However, the factfinder charged with determining whether debtor willfully disobeyed a court order neither was Judge Rhoades nor is this court; it was Judge Searcy. For the same reason, none of Judge Rhoades's orders that were predicated on imperfect compliance with a previous order required Judge Searcy to find that debtor willfully

disobeyed a lawful court order.[6] The factual record does not clearly indicate that debtor did, so this court does not find reversal warranted on creditors' § 727(a)(6)(A) arguments.

In sum, none of creditors' arguments on the merits of the discharge, or the bankruptcy court's alleged burden shifting, warrants reversal.

### D. Exhibit 44

Next, creditors argue that the bankruptcy court erred in discounting exhibit 44. Doc. 8 at 50. Exhibit 44 was a compilation of pieces of evidence, largely debtor's prior testimony. The parties agreed for it to be admitted into evidence as part of creditors' case-in-chief. Creditors' issue is that the bankruptcy court characterized their counsel's commentary on Exhibit 44 as "argument" rather than evidence. *Id.* To the extent that it was argument, which creditors do not concede, they argue that any objection to it was waived upon agreement. *Id.*

The bankruptcy court's factual finding was as follows:

> The Court did not find the testimony presented by [creditors'] counsel's reading of Exhibit 44 illustrative of the merits of [creditors'] allegations, as [creditors'] counsel's presentation contained much *argument* not ordinarily admitted into *evidence* comprising a case in chief.

Doc. 3-2 at 2594 (R. at 10055). Although Exhibit 44 was evidence, the bankruptcy court was correct that, at points, creditors' attorney's commentary during the reading of exhibit 44 was more argument than disinterested paraphrasing. *See, e.g., id.* at 2034 (R. at 9495) ("[H]e omitted his ownership interest in . . . Preferred

---

[6] The other two orders that creditors cite—the order granting creditors' motion to compel debtor to complete the Rule 2004 examination (Doc. 3-2 at 970 (R. at 8431)) and the order granting in part and denying in part creditors' motion to compel discovery and request for sanctions (Doc. 3-3 at 3193 (R. at 13,288))—did not impose further document-production duties. It is unclear in what way creditors think that debtor violated them. He paid the $500 sanction required by the latter order. It seems instead that creditors are using the orders as evidence that debtor violated the first two orders—the Rule 2004 order and the order granting their second motion to extend.

Platinum Construction. He omitted his ownership interest in Copper Creek."); *id.* at 2055 (R. at 9516) ("It's either he didn't have them because he didn't maintain them, or he's lying."). The bankruptcy court did not abuse its discretion in discounting such commentary, and creditors point to no indication that the court discounted the actual contents of the exhibit. Nor did agreeing to the admission of exhibit 44 waive any objection to creditors' counsel's editorializing during the reading.

Even if the bankruptcy court ignored exhibit 44 entirely and erred in so doing, that error was harmless. Exhibit 44 was introduced as a substitute for debtor's testimony that creditors would have elicited in their case-in-chief. Creditors acknowledged at oral argument that there were no questions that they would have asked debtor in their case-in-chief that they were unable to ask him on cross-examination. The bankruptcy court would not have reached a different result had it given more weight to exhibit 44 than creditors suggest it did. Accordingly, the bankruptcy court's evidentiary treatment of exhibit 44 does not justify reversal.

### E. Dismissal of motion for sanctions as moot

Finally, creditors argue that the bankruptcy court erred in dismissing their motions for sanctions as moot after it found for debtor on the merits. To summarize the events: debtor filed motions for death-penalty sanctions against creditors. Then, creditors filed motions for (among other things) monetary sanctions against debtor for their attorney fees incurred as a result of debtor's motions for death-penalty sanctions. Doc. 8 at 51–53. The basis for creditors' motions was Rule 9011, which authorizes a bankruptcy court to impose "an appropriate sanction on any attorney, law firm, or party" who commits a violation of 9011(b), including presenting a motion to the court "for any improper purpose." Fed. R. Bankr. P. 9011(b)(1), (c)(1). When the bankruptcy court found for debtor on the merits, it ruled that his death-penalty-sanctions motions were moot. When it so ruled, it also ruled that creditors' sanctions motions were moot.

Creditors are correct that their motions for sanctions were not mooted by the finding for debtor on the merits. The merits and the sanctions issue involve separate inquiries. *Cf., e.g.*, *Qureshi v. United States*, 600 F.3d 523, 525 (5th Cir. 2010) ("the court may, notwithstanding dismissal of the underlying action, impose sanctions"). Creditors' motions, essentially, were seeking damages for past conduct (debtor's filing of allegedly frivolous motions), not merely the cessation of ongoing conduct. The cessation does not moot the request for damages.

Debtor argues in response that his motion for death-penalty sanctions also sought attorney fees incurred in connection with the "voluminous amount of frivolous litigation initiated by [creditors] in multiple courts that would have reached millions of dollars." Doc. 10 at 35. In other words, debtor's motion was not moot either. Be that as it may, that is not a reason to affirm the bankruptcy court's dismissal of creditors' motion. Debtor did not appeal the denial of his motion for sanctions, so that is not before this court.

Whether sanctions were actually warranted against debtor is a much broader question, depending on the extent to which debtor was blameworthy for seeking death-penalty sanctions for creditors' conduct over the course of several years and several different litigation proceedings. Given the ambiguity of some of the bankruptcy court's findings on the underlying events, such as whether it actually found that the Valks caused the records to be destroyed, *see supra* subsection II.C.1, this court elects not to decide the merits of the sanctions motion or to express any opinion on it. Instead, that question is to be decided by the bankruptcy court on remand.

## III. Conclusion

For the reasons set forth above, the bankruptcy court's judgment is affirmed in part and reversed in part. As to debtor's discharge and all of the issues pertaining to the discharge, the judgment is affirmed. The court reverses the denial of creditors' motion for sanctions and remands for further consideration in accordance with this opinion.

*So ordered by the court on July 23, 2025.*

J. CAMPBELL BARKER
United States District Judge